J-S42017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.S.S., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: P.M. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 1137 EDA 2023 |

Appeal from the Order Entered April 19, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-AP-0000045-2021

BEFORE:  BOWES, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.:                **FILED FEBRUARY 22, 2024**

Appellant, P.M. ("Grandmother"), appeals from an order denying her petition to adopt her maternal granddaughter, M.S.S. ("Child"), and granting the petition of Child's paternal aunt and uncle, N.O. and C.T. ("Aunt and Uncle"), to adopt Child pursuant to the Adoption Act, 23 Pa. C.S.A. §§ 2010-2938.

On September 8, 2016, the Department of Human Services ("DHS") received a report alleging that Child's mother ("Mother") tested positive for marijuana at the time of Child's birth two days prior.  Family Ct. Op., 8/2/23, at 1.  Child was born premature at 29 weeks gestation and was admitted to the Neonatal Intensive Care Unit ("NICU") at Temple Hospital.  *Id.*   Mother was diagnosed with bipolar disorder and was hospitalized for mental health treatment in July 2016.  *Id.* at 1-2.  The report also alleged that Mother was

preventing Father, M.O., from visiting Child, which was later determined to be valid. *Id.* at 2.

On September 2016, a DHS caseworker visited Child at Temple Hospital and learned there was no discharge date for Child and Mother did not provide a name for the biological father. *Id.* The same day, DHS learned that Child was transferred to the natal intensive care unit at St. Christopher's Hospital for Children due to concerns with feeding and digestion. *Id.* Throughout October 2016, hospital staff informed DHS that Child was getting stronger, but would require long-term medical care. *Id.* They also informed DHS that Child's father ("Father") went to the hospital and identified himself as Child's biological father. *Id.*

On December 2, 2016, Father provided the name and contact information for Aunt and Uncle as potential kinship placement. *Id.* On December 5, 2016, DHS obtained an order for protective custody of Child, who was discharged the next day from the hospital and placed in the care of Aunt and Uncle. *Id.* On December 14, 2016, Child was adjudicated dependent and remained in Aunt and Uncle's home until August 26, 2019, when Child was removed and placed into Grandmother's care. *Id.* The reason for the change was to keep Child and her maternal half-brother, T.R., in the same

home.[1]  *Id.*  Aunt and Uncle were granted bi-weekly overnight weekend visits with Child on November 4, 2019.  *Id.* at 2-3.

Mother voluntarily relinquished her parental rights as to Child.  *Id.* at 3. On May 12, 2021, the trial court terminated the parental rights of Father and any putative father.  *Id.*  Aunt and Uncle filed a petition to adopt Child on June 25, 2021.  *Id.*  Grandmother filed a petition to adopt Child on December 7, 2021.  *Id.*  The juvenile court held hearings relating to the parties' petitions on June 16, 2022, November 3, 2022 and April 18, 2023.  At the conclusion of the April 18, 2023 hearing, the court denied Grandmother's petition to adopt Child and granted Aunt and Uncle's petition.  Grandmother filed a timely notice of appeal, and both Grandmother and the court complied with Pa.R.A.P. 1925.

Grandmother raises a single issue in this appeal:

Whether the trial court committed error and abused its discretion by denying Appellant's petition to adopt her granddaughter, subject child M.S.S., where Appellant was the child's current caregiver and primary custodian for over half of the child's life, where the child thrived, developed and established a loving parental bond and relationship with Appellant and her brother T.R., where the lower court's determination was not reasonably supported by the over six year case history, court record and the weight and credibility of the evidence and testimony presented at trial, and where the ruling was clearly not the disposition best suited to meet the child's best interests, needs and welfare as required under the Pennsylvania Adoption Act, 23 Pa. C.S.A. §§2101 et seq.?

_____

[1] T.R. resided with Grandmother, who was granted permanent legal custody on January 17, 2020.

Maternal Grandmother's Brief at 5.

Regarding adoption, we review the trial court's determinations for an abuse of discretion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). This Court has stated:

> An abuse of discretion does not exist merely because a reviewing court would have reached a different conclusion. Appellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

*Id*. While we are not bound by findings of fact unsupported by the record or the court's inferences drawn from the facts, we defer to the findings of the trial judge with regard to credibility and weight of the evidence. *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996).

In adoption matters, the paramount concern is the best interests of the child. *K.D.*, 144 A.3d at 151. "This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *A.S.H.*, 674 A.2d at 700 (citations omitted); *see also* 23 Pa.C.S. § 2902(a). Once parental rights have been terminated:

> anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided. Furthermore, a trial court must base its conclusions in an adoption case upon all relevant information discerned with the full participation of all interested parties.

*In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa. Super. 1996).

*In re Interest of S.D.R.*, 2019 WL 7372806, *3-4 (Pa. Super., Dec. 31, 2019).

- 4 -

The juvenile court observed:

[During] the [April 18, 2023] hearing, [Grandmother] testified that she would like to be Child's adoptive mother and that she is committed to caring for Child's emotional, physical, and medical wellbeing. She testified that she does not have any reservations regarding her ability to care for Child and that she has a good understanding of Child's ongoing needs. [Grandmother] testified that Child has lived with her for almost four years and lived with [Aunt and Uncle] prior. She testified that Child looks to her for comfort, love and support, and she expresses her love to Child and Child's reciprocates that love to her. [Grandmother] stated that Child calls her "grandmom".

[Grandmother] described Child's relationship with her 15-year-old brother, T.R., to be loving and nurturing. She testified that Child looks to him for leadership and that Child is excited about his accomplishments. She testified that T.R. is a very good big brother. [Grandmother] testified that Child does not exhibit any major behavioral problems at home or at school. She testified that she is available to pick Child up from school and drop her off every day. She stated that she is also able and does take Child to her medical appointments. [Grandmother] testified that she is a religious person and that her, Child, and T.R. attends church via Zoom on Sundays. She testified that Child enjoys being included in family get-togethers and is considered part of her family. She further testified that when Child has missed family gatherings or planned activities when visiting [Aunt and Uncle], Child has expressed disappointment. [Grandmother] stated that she believes Child loves [Aunt and Uncle] and enjoys spending time with [them]. She testified that Child currently spends every other weekend with Aunt and Uncle. She stated that she believes it would be helpful for Child to continue having a relationship with [Aunt and Uncle]. However, [Grandmother] stated that Child has occasionally expressed that she would prefer not to visit with [Aunt and Uncle]. She further stated that Child is not reluctant to go to visits with [Aunt and Uncle], but when she returns, Child sometimes says that she was ready to come home.

[Grandmother] testified that she is working to build a better relationship with [Aunt and Uncle] and believes if she adopts Child the relationship may improve. [Grandmother] testified that she believes their relationship will improve for Child's sake because Child loves them and enjoys being with her aunt and with her.

- 5 -

She stated that if she was granted the adoption of Child she would be committed to continuing Child's relationship with [Aunt and Uncle].

[Grandmother] also testified that if she was granted the adoption of Child, she would be willing to sign a post-adoption agreement for the paternal family to have visitation with Child.

[Grandmother] testified that she has a significant other, Edward Flippen, and she believes Child is safe in his presence. She described Mr. Flippen as a good, strong man who is positive and loving. She stated that Mr. Flippen has been very nurturing to Child, and that she and Child are comfortable with him. She testified that Child and T.R. calls Mr. Flippen "Grandpop Ed." She testified that Mr. Flippen takes Child to school every day and provides a ride for [Grandmother] and Child to get to Child's appointments and extra activities.

[Grandmother] testified that she is aware that Mr. Flippen has a criminal history dating back a number of years and that history is not a concern. She testified that she known Mr. Flippen for over thirty years and that they have been in a relationship for the past fifteen years. She testified that she does not take the kids to Mr. Flippen's home nor does she or the kids know where Mr. Flippen lives. She testified that she is not currently married but was married to a John Moore whom she divorced from on March 15, 2011. [Grandmother] denied ever telling the child profile writer that she was married to Albert Sapp, Child's maternal grandfather.

[Grandmother] testified that Child enjoys to dance, she likes theater, playing the piano, and is interested in baseball and boxing. She testified that she involves Child in educational enrichment programs. She further stated that Child is not enrolled in dance this year, nor is she enrolled in baseball or boxing. [Grandmother] testified that Aunt and Uncle offered to enroll Child in swimming and to take her to her lessons but she declined the offer. She stated that the lessons would interfere with her time. [Grandmother] testified that she was not willing to give up her scheduled time with Child for swim lessons because she wanted to be able to do what she wanted with Child on her weekends. She testified that she did not know the details for the swim class, such as, the duration of the class nor the weekly time commitment. However, [Grandmother] testified that she planned on enrolling Child in swimming herself. [Grandmother] further

testified that a court order was entered allowing Child to go to Disney World with Aunt and Uncle, but she testified that she never was asked whether or not she wanted Child to go.

At the hearing, T.R., Child's older brother, testified that this was not his first time testifying for this case and that he previously testified to make sure Child stays with him and his grandmother. T.R. testified that he has lived with his grandmother all of his life and that she takes good care of him. He stated that he feels loved by his grandmother and that he loves his grandmother and sister. T.R. stated that he likes living with [Grandmother] and Child, and that he would like for Child to continue living with them. He testified that he and Child watch movies together and play with her toys. T.R. testified that Child has occasionally expressed not wanting to go to a visit at her aunt and uncle's house. However, he testified that Child is happy when she comes homes, Child talks about having a good time, and about her dog.

During closing arguments, Child Advocate, Aaron Mixon, Esquire, testified that he believed that [Aunt and Uncle]'s relationship probably would not continue if [Grandmother] were to be Child's adoptive parent. He testified that ceasing contact with Child's aunt and uncle, who raised Child for the first three years of her life, is not in the best interest of Child.

After closing statements and this Court's ruling, the Judge provided a brief summary as to the conversation he had with Child with all counsel present. The Court asked Child if she knew why she was there and Child nodded her head that she did. The Court next asked Child if she knew who he was and what his job was, and he told her it was to decide who she was going to live with. The Court then asked Child if she wanted to help decide who she was going to live with. Child responded that she did not have a preference which family member she lived with.

Family Ct. Op., 8/2/23, at 3-7 (cleaned up; record citations omitted).

The court continued, however, that Grandmother's testimony raised

"serious credibility concerns." *Id.* at 8. The court elaborated:

During the bifurcated hearings, there was testimony from [Grandmother] wherein her background was discussed extensively, which included her current employment status,

current debts, prior marriages, current paramour, and her relationship with Child. [Grandmother] testified that she is able to meet all of Child's needs, however, she failed to mention who helps her meet these needs. [Grandmother] testified that she has been dating a man by the name of Edward Flippen for the past 15 years. Mr. Flippen plays a major part in Child's life by providing daily transportation to and from school and transportation for extra activities. Child even calls him "Grandpop Ed." However, in an attempt to bypass a criminal background search of Mr. Flippen, [Grandmother] testified that she does not know where Mr. Flippen lives and neither she nor Child have ever been to his residence. A background search into Mr. Flippen revealed that he has a criminal history. [Grandmother] testified that she was aware of his criminal history. She stated that Mr. Flippen's criminal history is not a concern of hers. However, Mr. Flippen is the main resource [Grandmother] uses to ensure she is able to meet all of Child's needs by providing transportation for all [Grandmother] and Child's travels. Due to the extensive contact between Mr. Flippen and Child, a criminal background should have been conducted on Mr. Flippen. Moreover, [Grandmother] was not candid with the Court or DHS about Mr. Flippen. [Grandmother] failed to include him in the family profile and conveniently left him out of her Petition for Adoption. Mr. Flippen makes himself available to meet all of Child's needs outside of the home for appointments, school, and extra activities. Ensuring Mr. Flippen received the required clearances and background check was in the best interest of the Child, but [Grandmother] would rather conceal Mr. Flippen's criminal history.

[Grandmother] repeatedly misrepresented facts and withheld information throughout the hearing. [Grandmother] reported that she receives Social Security Disability income, and the evidence proved that she is working gainful employment as the owner, editor, and distributor of "What's Happening Philadelphia." [Grandmother] has published Child's photo and name in the newspaper that is published around the City of Philadelphia. [Grandmother] violated the foster care rules when she published Child's kindergarten graduation picture, identified her by name, and listed the name of the school that she was currently attending and the name of the school that she was going to go to for first grade.

At the hearing, one of [Grandmother]'s argument in support of her petition was that the Child's maternal half-biological sibling

- 8 -

resides with her and she believes that the siblings should be raised together knowing one another. Child's maternal half-biological sibling is fifteen years old. This Court is not persuaded by the argument that Child should be raised with her biological sibling when that sibling has essentially already been raised. Finally, this Court believes that [Grandmother] does not support the relationship between Child and the paternal side of her family to continue. Prior to Child's removal, Aunt supported Maternal Grandmother and Child's relationship and never tried to prevent Child from visiting [Grandmother]. Notably, the testimony throughout the hearing demonstrated that [Grandmother] herself became a barrier between Child and her paternal family's relationship. [Grandmother] denied [Aunt and Uncle's] request to take Child to Disney World which was then Court ordered. [Grandmother] testified that she was going to enroll Child in swimming lessons after she denied Aunt's request to enroll Child in swimming lessons. [Grandmother] further testified that the only reason she denied Aunt's request is because the swimming lesson would interfere with her weekend time with Child and did not want to share her time. [Grandmother] also testified that Child engages in extra activities and/or educational enrichment programs, however, when asked whether or not she was enrolled in those programs, she admitted that Child was not. Throughout the life of this case, [Grandmother] has consistently undermined the paternal family and made decisions that aligned with her own self-interests instead of Child's best interest.

*Id.* at 8-10 (record citations omitted).

The court reasoned that all parties love Child, and Child has a bond with all parties, but it was in Child's best interest for Aunt and Uncle to adopt her instead of Grandmother:

The testimony demonstrated that Child has been in the care of [Grandmother] for almost four (4) years and [Aunt and Uncle] for the initial three (3) years of her life. Specifically, Child was placed—by the request of Father—with [Aunt and Uncle] at birth in 2016 and remained with them until the Court found that it was the best interest, at that time, for the siblings to be placed together. There was ample testimony that Child shares a bond with both [Aunt and Uncle] and [Grandmother]. There was also testimony that both [Grandmother] and [Aunt and Uncle] can

- 9 -

meet all of Child's needs. It is certain that both parties love Child and wants her to live with them. However, [Grandmother] has shown she will not allow Child to maintain her relationship with [Aunt and Uncle]. [Aunt and Uncle] were required to get the Court's permission to take Child to Disney World because the trip would interfere with [Grandmother] and Child's time together. [Grandmother] ceased communications with [Aunt and Uncle] during the pandemic and would not even allow virtual visits, which led to the filing of their Petition for Adoption. The Child Advocate testified that it would not be in the best interest of the Child to be adopted by [Grandmother]. The Child Advocate believed that [Grandmother] would again cease communications with [Aunt and Uncle], which would be detrimental to Child's given their bond. Furthermore, when Child was asked about which family she wanted to live with, Child did not have a preference[,] which shows she loves them both and wants to maintain a relationship with both parties. This Court wants to preserve the whole family unit. For the foregoing reasons, this Court properly determined that it was in the Child's best interest to be adopted by [Aunt and Uncle].

*Id.* at 11-12.

We conclude that the court's decision to deny Grandmother's petition for adoption and grant Aunt and Uncle's petition was not an abuse of discretion. The court reached its decision by reviewing all evidence of record carefully and weighing all factors in determining Child's best interests. It is undisputed that Grandmother, and Aunt and Uncle, have a strong bond with Child and are willing and able to meet the Child's needs. The court found that Grandmother had several serious credibility problems, such as her failure to include Flippen in the family profile or in her adoption petition, and the fact that she receives social security disability income despite also being gainfully employed. *Id.* at 8-10. The failure to include Flippen in the petition is significant because, as the trial court noted, Flippen has a criminal history and

- 10 -

spent a substantial amount of time with Child. We defer to this credibility determination, since nothing in the record indicates that it is manifestly unreasonable. **A.S.H.**, 674 A.2d at 700. Moreover, the court determined that Aunt and Uncle would preserve the entire family unit, while Grandmother would cut off Child's access to Aunt and Uncle and disrupt the bond between them. **Id.** at 11-12. Based on our own review of the record, we conclude that it provides ample evidence for this determination. The record, in short, supports the court's conclusion that denying Grandmother's petition and granting Aunt and Uncle's petition was in Child's best interests.

For these reasons, we affirm the order denying Grandmother's adoption petition and granting Aunt and Uncle's adoption petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/22/2024

- 11 -